All right, we can't hear you, Pam. Go ahead. Okay. Everyone's in. Hear ye, hear ye. The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States in this honorable court. Thank you. And welcome, everyone. Appreciate you handling this by zoom. It avoids everyone having to travel on just one case. But thank you for being here. This is an important case. So we do need to have the oral argument. As you well know, you have your limited time. But if we're still asking questions, you need to keep answering. And obviously don't interfere with anyone else. And be sure and take off your your turn on your audio when you're talking. Turn it off when you're not. So with that, we will begin with case number 24-60055 Arnesen v. Raimondo. And we will begin with John Thompson for the Bradley et al. Thank you, Your Honor, and may it please the court. John Henry Thompson for appellants George Arnesen and Ryan Bradley. Congress gave fishery management councils significant policymaking authority over federal fisheries. They develop and superintend the key regulatory frameworks and can exercise unreviewable policy judgment, both by blocking and compelling action by a cabinet secretary. Despite this, council members are almost exclusively selected by state officials, either unilaterally or through a rigid nominating process. And they are removable, if at all, in only exceedingly narrow circumstances. The threshold question in this case is whether those members are officers subject to the appointments clause. They clearly are. As this court held on Friday in Braidwood Management, even freely removable officials staffed on a task force deep within the HHS bureaucracy are principal officers if they have the power to issue legally binding decisions without review. And the councils can do exactly that in at least three ways. They can shield federal fishery policies from repeal by the Secretary of Commerce. They have the final binding say on whether to impose a limited access system over their fisheries. And they can order the secretary to develop and issue federal regulations whenever they deem an emergency to exist. And as they do so, they are virtually immune from the threat of removal. When you say unreviewable, has any circuit or even the Supreme Court in the immense amount of litigation about Loper Bright and Relentless, has any circuit court interpreted fishery council authority to be unreviewable yet? No, Your Honor, this issue has not. These particular issues have not come up in any circuit level litigation. Well, they did come up right in the Goethal case in the First Circuit, even though it was ultimately concluded to be untimely. So it did come before that circuit, didn't it? Yes. Yeah, Your Honor, that circuit did have some some dicta on this. It was barely a couple of sentences of analysis, and it ended up disposing of that case on statute of limitations grounds. So and also just to clarify, I don't believe that court was considering the authorities I just mentioned. Right there. There is some secretarial review of a subset of the council's actions. But the ones I was just referring to are completely outside of that review umbrella that was has been at issue in all the other cases. But to test you on that, would it be fair to say, and I'm going to use a loaded word that you'll resist, but those are ancillary provisions that were not utilized in this particular Amendment 54 limit, correct? Your Honor, it is absolutely correct that those powers were not brought to bear against our clients. But under this court's decision in Collins, Embank, and under Freytag itself, we know that you have to evaluate all the various authorities that an official has under the statute when trying to determine whether they are a lesser functionary under Lucia or whether they wield significant authority. And I think any one of those would suffice to give the council members more authority than, say, the clerk of a district court, which the court in Buckley said was indisputably an inferior officer. So the fact that they weren't brought to bear here doesn't matter. But of those three that you've identified, the repeal, the emergency and the limited access, which do you think is the most the word you the phrase you use down below to the district court is direct compulsion on the secretary? Or do you think all three are equally compelling? Well, they all three completely override the secretary's determination on the particular thing that the council is deciding to to do right. So if the secretary wants the application, the secretary has a veto, right? With a vote one vote. Yes, you're correct about that. It must be a unanimous decision of the council. That is correct. That is correct. But if that if that condition is satisfied, if the council as a collective decides without any dissent that there is an emergency that requires regulations to be addressed, then the secretary has absolutely no authority to say no. Thank you. I disagree. I will not be proceeding. And once that emergency regulation goes into effect, the council has to, again, authorize the secretary to get rid of it early. So, right. Again, it's a you if you want to call it ancillary, I mean, I think it is a it's a particular regulatory structure within the act. But the authority that the council wheels within that portion of the act, I think, has to qualify as significant under the court standard. But, you know, if we if we go to the even if we talked about the parts of the statute, the parts of the council's power where the secretary can review. Right. The council's developed the regulatory frameworks, and these are not, as the government would have it, indistinguishable from with voicemails from concerned citizens or letters from lobbyists. Right. These form the substance of federal law, and they must be approved provided they meet statutory standards. So, you know, I think an analogy might drive this home. So early in my career, I was a Bristow fellow in the office of the solicitor general. And part of my job was to write recommendations to the SG about whether to take an appeal from a government defeat in trial court. Now, just because I wrote about important things on government letterhead, I wasn't an officer because the SG had no obligation to even consider my recommendation, much less approve it. But imagine this. Right. Imagine there was a statutory scheme that created my job and also said that the SG had to follow my recommendations if he found that they satisfied an objective standard. And presume also there's another set of cases where the SG can never take an appeal unless I say he can't. And say there's another set of cases where the SG must take an appeal if I say yes. I see that point. I mean, Braidwood Management, I really appreciate the two appellants, 28J, but that task force, the court drew distinction with other agencies that pursue policy. And that one was found to be unreviewable, had complete autonomy, free from any supervision. The secretary has no power over their recommendations. In fact, the secretary is ministerial. So isn't the logical conclusion from that decision issued on Friday that these fishery councils are much more analogous to the two entities that were found to be reviewed? Well, Your Honor, for the reasons we discussed in the first part of the argument, I wouldn't concede the premise. But I also didn't think the conclusion follows right. What the government has to establish here is that these are not just merely inferior officers. They've hung their hat on the idea that these are part of what Lucia called the broad swath of lesser functionaries in the federal workforce. And Braidwood did not consider much or suggest much less whole that any of the people it was considering were mere employees under that low bar. Yes, I guess if with permission of the presiding judge. Yes, thank you. I guess I know all counselors superbly prepared. I'm thinking more the line of D.C. Circuit authority that the district court relied on and the government's relying on that says, let's assume an appointments cause violation. Why doesn't Braidwood now give us reason to affirm the district court's ratification theory? That's that's, I guess, my last question. Understood, Your Honor. And I've got a couple of points on that, if I could try to get them out for you guys. So the first problem with that, I think, just as a threshold matter, Braidwood did not purport to embrace this line of cases. But let's assume that away. Let's say that this is sometimes a viable solution to an appointments clause problem. So no ratification happened here. And again, I think an analogy might help. Right. Let's say that the president holds a signing ceremony for a major piece of legislation. And the only problem is that Congress never passed that legislation. Some White House staffer put the text of a proposed bill on the Resolute Desk and the president pulled out his pen and signed it. No one would say that the president's signature changed anything. Right. Because when you skip a predicate step in a two-step process, that's not ratification. It's just illegal. And I think what the government would say is, well, what if there are some components of that bill the president signed that he could have also done through an executive order? Right. Well, again, we would dispute that premise here. But the point is, he didn't issue an executive order. He signed a bogus piece of legislation. That is void ab initio. No one has to follow it. That's an illegal act. Thank you. Okay. Well, you saved time for rebuttal. Let's turn to Michael Poon, who represents Bell et al. And before you even get into whatever you want to talk about, I do want to ask kind of a hypothetical question. You have asked that we reverse. That's your conclusion. Well, let's say that, hypothetically, we entered an opinion that simply said, we hereby reverse and remand. Thank you very much. And that's our opinion. What would happen next in the district court? If this panel were to reverse, then it depends on how the panel reverses. If the panel holds that the council members must be appointed as principal officers, as we argue, and doesn't reach any of the remedy questions, then I suppose the district court would have to reach those remedy questions and decide whether to vacate, which it should do. Because the actions of the council members would be what happens next. Well, I mean, y'all just said in your conclusion that we should reverse the district court. You didn't give any details about what that really means. So I'm trying to just understand that. We may not reverse, in which case it doesn't matter. But I try to cover everything when we're at OA, so we know. So please be a little more detailed than you were in your conclusion. Yes, Your Honor. We would ask the court to hold that the council members must be appointed as principal officers and that their actions are void ab initio, and accordingly, that the National Marine Fishery Service has no authority under Section 1854B to issue the final rule at issue, and that the district court was therefore mistaken in not vacating the rule. And the reversal would be in with the implication that the district court would then vacate the regulation. But that's a really important question Judge Haynes is asking, because isn't the logic of that, then we would essentially be superseding the entire issue before the Supreme Court and relentless and loper because Amendment 16 was a New England Fishery Council herring limit promulgated this with through the exact same machinery. So the logic of your argument would be here in the Fifth Circuit. If we would be not only superseding what the Supreme Court is about to issue, but we would also, I take it, be invalidating all fish catch limits in the last 50 years that came up through fishery councils. Is that your position? No, Your Honor. That would not be the effect of this panel's decision if they were to go along with what the bail plaintiffs are arguing for. The 30-day statute of limitations for the Magnuson-Stevens final regulation, final rules, would protect all existing regulations. So it's not that the past 50 years of fishery regulations would then be thrown out. But the Loper-Bright relentless, that was challenged within 30 days. That's true, Your Honor. But in this litigation, we're not challenging that amendment. So it's just not an issue here. The vacator of the final rule here would only be of the final rule implementing Amendment 54. I guess I'm just pushing back because that there, even you participated, the Pacific Legal Foundation did, and at the cert stage and after the question was limited. And it would seem to me the separation of powers question is, as your co-counsel said, the threshold one before you assume agency action and test whether it gets deference under Chevron. That would be the case if there are multiple grounds for any particular regulation to be cast into doubt. Here, I don't think Loper-Bright really bears on this case. And the claims that were brought here are the Appointments Clause claims that we have here. The Loper-Bright's not really affecting this litigation. It would seem to me maybe a lot of this case, this is my pushback. A lot of this comes down to the concept in Freytag that you assess inferior status based on powers that could exist anywhere, even if not used in the particularly challenged agency action. Would you agree that that's crucial or would you say they're still exercising significant authority even in their proposed, the catch limit goes up, gets tested according to national standards, notice and comment, secretary promulgates it? Absolutely. The councils are still exercising significant authority within the two-step rulemaking process. It's not at all the case that we're limited to the powers outside of the two-step rulemaking process in our arguments. But I do think the Supreme Court has been clear, both in Freytag and in Lucia, that you look at all of the decisions or the powers that the council wields, not just the ones at issue. And it explicitly did that in Freytag and I think in footnote four of Lucia, it says it doesn't make sense to consider officials to be officers in some situations and employees in others. And the same applies here. Yes. Well, we'll be, I mean, of course, if I have time, I'll ask the government about those provisions, 1854H, 1855C2A and 1854C3. And yet I don't, I think as Mr. Thompson said, those powers weren't exercised here, yet they may, and that may under Freytag, you're right, create the officer status. But I'm still, maybe could you switch to Braidwood management and say, why wouldn't we be affirming the district court's ratification theory under DC circuit law, third circuit law, and now fifth circuit law as of Friday? So your honor, I do not believe that Braidwood management embraced the ratification theory. It said that these are important questions that were not fully briefed. I think that's true here. Wait, wait, Braidwood management didn't? No, I think it contemplated that it's possible ratification could be, could be possible. I know it just came out, but counsel, let me read a sentence at the outset. We agree with the government that Secretary Becerra has the authority to ratify their recommendations and guidelines, but we reserve judgment on whether he has effectively done so. We agree with the government that Secretary Becerra has the authority to ratify. How is that not a binding fifth circuit statement that ratification does apply to appointment clause infringements? So one of the, one of the arguments before the court in Braidwood was that there is no statutory authority to ratify because ratification is inherently retroactive and therefore any sort of statutory authority to ratify has to be expressed and that that is lacking in that statutory scheme. So although Braidwood management embraced the possibility of ratification, of ratification being exercised there, it remanded on the question of the retroactivity issue. And that shows that Braidwood held that it's, it's not accepting that in this particular ratification situation, there is, there is statutory authority to ratify. And that is similar to what we would argue here as well. You've saved time for rebuttal. Thank you. And we will now turn to the appellee attorney. Is it John Biese or how do you pronounce? Thank you. Biese. Thank you. Okay. Good morning, your honors. May it please the court. I'm John Biese on behalf of the federal defendants. I'd like to start with a quick overview of how we see the case. We think there's a straightforward answer to the plaintiff's complaint that regional councils are, play only an advisory role and lack legal power to execute or administer the law. We think there's three steps in the court's analysis, each of which independently can lead to this result. First, in the court's order of operations is a plain text of the statute. We think if you review the Magnuson-Stevens Act from front to back, the plain text and the structure of the act support our view. There are no express limits in the text on the secretary's review of council proposals. Second, even if the court thinks there's some ambiguity on that point, we think constitutional avoidance requires the same result. Plaintiffs rely on inferences and implications to say that the secretary's power to review is limited, but the court's duty is to contribute statutes to avoid, not to manufacture a constitutional conflict. And third, even if the court thinks that act unambiguously empowers the council to bind the secretary, we think those provisions are displaced as repugnant to the constitution. Plaintiffs instead argue that the court should leave federal fisheries effectively unregulated, which is inconsistent with Congress's clear purpose to ensure that the nation's fisheries are managed and conserved. Okay, so the third one is the problem for me, right? Because that's a policy argument. And as both counsel have just said, the Supreme Court in Freytag said, you know, the tail wags the dog. If you're an inferior officer with any powers, therefore that's what you are. And so I didn't see in your brief convincing answers to the powers we've talked about, the emergency power, the limited access power, and the repeal revoke power. I guess taking those in turn, the emergency access power, the Congress, the council can request that the secretary, and if there's a unanimous request, the council shall promulgate emergency measures. That's pretty constraining. If they do it, you shall do it. That sounds like a legally binding authority. But the secretary is represented on the council by an employee subject to her direction. And so there will not be a veto authority. Okay. I'm just moving you forward. Just add, in addition to veto authority, the management measure can be anything in substance the secretary wants. So it wouldn't necessarily have. Is that person required to ask the secretary, what should I do? There is a standing policy that the regional administrator will be present for every meeting and will oppose every emergency measure vote at the agency. And that employee is subject to the secretary's direction on what she does, what he does. The secretary tells them how to vote. So why isn't the secretary just in the council? The secretary has a lot of responsibilities. I mean, the case is really about COID. So why wouldn't COID just sit in the council and do the voting? Turning to the 1854— Can you answer my question? Sorry? My understanding from their side is that that 17th person can vote how they think proper, even though they're supposed to be kind of under the secretary. But if you're saying they have to do what the secretary says, why wouldn't COID be that person? Well, I think if you look at Braidwood management, for instance, you can see an important difference that's not present here. In that case, there was a statutory provision that said the task force members are independent and politically insulated from secretarial authority. And the Braidwood court said that created a problem for the secretary's supervision of the task force members. There's nothing like that here for the regional director. The regional director is an employee of NIMS and is subject to the direction of the assistant administrator, COID, and the secretary, and how the regional administrator performs that role on the council. And in fact, as I said, there is a standing agency directive in their policies and procedures that they shall be present and shall vote against any emergency measure. In fact, that is why they are considered an accepted employee when there's a government shutdown, so that they can be present to perform that role. But that answer is not going to get you around 1854-H. So I think 1854-H is a limited concurrence provision. It does not allow the council to act, to execute, or administer the law. It just requires a concurrence of the secretary, I'm sorry, the concurrence of the council if the secretary wants to revoke or repeal a plan. Well, it requires a concurrence. That sounds like legally binding significant authority. It's a constraint on the secretary's discretion. It can only do this, repeal or revoke an entire plan, if three-quarters of the council agrees. That's – how is that not – go ahead. There's three ways we would argue that that's not significant authority. First is, as a number, of course, have recognized, a limited concurrence provision is not significant authority. There are cases for gubernatorial concurrence for – under the Indian Game and Regulatory Act, when the government takes land into trust for gaming purposes, that both the Seventh Circuit and the Ninth Circuit is upheld. And there's older Supreme Court cases, like Curran v. Wallace, where there was a provision that said the Secretary of Agriculture can designate a market for tobacco standards if two-thirds of the growers in the market vote to allow the secretary to designate it. And the court upheld that as not an improper – the concurrence of the agreement – Are any of the cases that you're citing to us, do any of them post-date the FRAE tag that's so difficult on this question? I do not have at the top of my head the dates for the Seventh and Ninth Circuit opinions on the Indian Gaming Regulatory Act, so I'm not sure. FRAE tag was 1993. I think they post-date that, but I'm not certain. Let me ask you a question, though. Can you give us any other examples of officers who are appointed in a similar matter as these council members? That is, the governor nominates, and the secretary must confirm as long as they're qualified. So, there are some examples in the footnote in Meijer that we cite of places where the person who identifies candidates for an officer position is different than the person who makes the appointment decision. But again, you only reach that question if you've already decided that they are, in fact, inferior officers, which we think they are not. What exactly are they? I mean, they are not Article II employees. They're not contractors. They're not private citizens. They are employees, or they are not employees. I think they are effectively special government employees for a limited purpose. Special government employees, because you cite, you do cite in your brief, off-mort. I don't think you're trying to suggest that we should be applying germane off-mort and the duration limit. You're not saying they're not officers by virtue of that line of authority, are you? I think our view is that they have a temporary and episodic role and so don't have a continuing position. But I think we recognize that's a difficult position in light of the current case law on that issue. So you're accepting the Buckley significant authority test and you're just saying these are what Buckley called whatever the functionaries, lower functionaries, is that the expression? Yeah, I think significant authority is a modern shorthand for legal power to exercise the laws of the United States, to administer or execute the law. I think if you look at the OLC memo by Stephen Bradbury, we cite there's a long discussion on how if you go back to the founding and early common law, that really means you must be invested with sovereign power to execute the law and you have to have significant discretion in how you do it. So turning back to the repeal and replace, sorry, the repeal or revoke provision, we think a concurrence provision alone isn't that kind of legal power, but we also think even if you thought it was, it's not an important government function because it's a quite repeal and revocation happens very rarely. I think in 50 years under the act, it has happened once. Just give me your best authority. If it's limited scope authority, that sort of is the limiting principle behind FRATEG. What's your best case that says that? Well, I think even Fritag and Lucia talk about important government functions and the question is whether or not this qualifies as an important government function where it's in this limited small area and is unlikely to happen in practice very often. And also, I think you have to remember the main issue is Congress sets the policy, whether or not a fishery is required to have a fishery management plan in place, whether it needs conservation and management is set by standards set by Congress, and it can only be repealed if there's an adequate basis to do that, which is pretty unlikely to happen given the standards for when you need a fishery management policy plan. So it's something that doesn't happen very often. I think historically, it's happened to the extent people can remember only less than a handful of times. And then I guess the final thing is, if you think that particular provision on this ancillary issue creates a problem, there is also the option to sever it. Yeah, I was interested in your brief that it sounds like from a sequencing standpoint, you'd prefer an arthritic severance to just to straight affirm on a ratification theory. Is that a fair characterization of the government's position? I think we would be, I think, happy with either outcome. But I think from our perspective, it's important for the long-term health of the fisheries and to ensure that Congress's purpose, their purpose in the act, ensure the conservation and maintenance of the nation's fisheries to have clear authority for the Secretary to act to protect the fishery resources. Okay, let me ask that then. I'll ask you the hypo. What if we just, and again, I'm not saying, we may affirm, we may write a 100-page opinion. But if we just entered an opinion that said, we hereby reverse and revand, have a nice day, then what would you think would happen in the district court? Well, obviously, I think what exactly would need to happen would depend some on the reasons why the reversal happened. But I think from our perspective, if there was a reversal because we thought, because the court thought the act unduly constrained the Secretary's review of council proposals, it should be remanded without vacatur for the Secretary or the Assistant Administrator to reconsider, free from any constraints that the court concludes are constitutionally problematic. And it could be that she would reach the same conclusion on what the appropriate catch limit is. Well, in terms of severability, what is the relevant intent of Congress in passing the Magnuson-Stevens Act? Well, from our perspective, Congress's primary intent was to ensure the conservation and management of the nation's fishery resources. And they wanted to do that in a way that took into account state and local perspectives. I think it's important to pause and think about kind of the breathtaking implications of the plaintiff's perspective on this. They effectively contend that any plan or amendment that can be traced back to the council proposal is void, and that the Secretary has limited authorities to fill that void. If that's right, that would leave federal fisheries effectively unregulated against predation and threaten the sustainability of the fisheries. If you think about that in terms of the greater Gulf amberjack here, it's already overfished and struggling to rebuild. If commercial and recreational fishermen do not have to limit their catch to the level necessary to permit rebuilding, this critical stock might survive. It's a classic tragedy of commons. We understand everyone in their short-term interest wants to catch as many fish as possible, but that effectively over time will destroy the fishery. That's why Congress enacted this law. And plaintiff's response to that is twofold. One is a statute of limitations might protect them, although it's not clear with corner post still pending whether that's true. But annual catch limits anyways need to be updated every year depending on the features in the fisheries, so that would be only limited protection anyways. And then second, they point to the states. They say the states can step in and regulate, but that really misunderstands the state roles in fishery management. States only have authority over state jurisdictional waters to fully manage the fishery there. Outside of that, in the federal fishery, they have no authority except over state-permitted boats. But in a fishery where there's boats from multiple states, no one state can ensure that limits necessary to sustainability can be met. That is why Congress passed this act. I did want to turn for a second because I hadn't gotten to it, the limited access provision. Again, we view that as another limited concurrence requirement. The council cannot impose a limited access system. They can only provide concurrence if the secretary wants to impose it.  So, we don't think those, again, are significant authority because we don't think it's legal power in the first instance, and we don't think it's important enough in the second instance. And again, it can be severed if necessary if the court thinks otherwise. We've been concerned about severance, and I stay concerned if the state participation was such a crucial founding principle, we'd have to go through with a blue pen and knock out quite a bit of state authority. I don't think there's really state authority here. It's more the council's voice. Well, state authority expressed through the council membership. It's the Myers-Footnote 56 situation. The only entity that I saw described in that footnote no longer exists in terms of state governors, correct? That could be true. I'm not certain. I think from our perspective, it's difficult to say what should be severed where we think there doesn't need to be anything severed. But if you think that there are constraints where the council can bind the secretary in its review of council proposals, and you think those constraints are problematic, we think they can be severed. And then there are the three provisions we talked about. Each of them, we think, is an ancillary provision that we don't think confer a significant authority. But if you think those three need to be severed, they can be severed. And we think that is all you would need to do here to make the council, even from that perspective, to make clear that the council plays only an advisory role. Oh, excuse me. You cited Moose Juice, and there the D.C. Circuit assumed for the sake of argument an appointments clause violation, but then found ratification. And I think here it's clear that the secretary does have authority to impose catch limits to ensure rebuilding of the Amberjack stock under 1854E5. And if the council proposal was invalid in January and was made as of April, two years after the notice, the secretary would have had authority to impose the catch limits herself here. So we think that she could do that here. But both in their brief and in the 28J, they point out that the authority exercised was in 1854B1, not in E. Because the secretary understood the council proposal to be valid, but she has the authority to act here regardless of that. I do want to turn briefly to talk about Braidwood. There's three features in Braidwood of the scheme that were significant, we think, to the court. First was the unreviewable power of the task force to issue preventative care recommendations that insurers must cover by law. That's in the slip-off at two. The parties agreed that that made the task force members inferior officers, so it wasn't contested in the appeal. And then the court also looked at the statutory authority of the secretary to review the council's recommendations and the express statutory installation of the task members from secretarial interference. That's in slip-off at 18 and 21. And the court evaluates that to look at whether or not the court in that case evaluated that and looked at whether or not they were principled or not. All three of those features are absent in the Magnuson-Stevens Act. No council actions have a direct effect on fishery participants without the secretary's approval and implementation by regulation. The secretary has express authority to review council proposals, and there's no express limitation or installation of the secretary in her review of council actions. I should mention, unless you've already filed it and I just didn't get the copy yet, if you haven't responded to the Braidwood 28Js, please do promptly. Yeah, we have not had an opportunity to do that. Okay. We won't. Second, on ratification, as you know, the Braidwood court concluded that the HHS secretary does not have statutory authority to review, revise, or issue the preventative care recommendations themselves. That's slip-off at 24. Of course, here, the secretary has both unilateral authority and an obligation to impose catch limits necessary to permit rebuilding, both under 1854E5, and she could also do it under 1854C1A if the council didn't provide a valid proposal in a reasonable period of time. And then on severance, I'd also note that Braidwood says it's plausible that the limitations on the secretary review the task force recommendations could be severed on slip-off 27, but concludes that this wouldn't solve the problem because there's no statutory provision that empowers the secretary of HHS to review or revise the task force's recommendations. Of course, that doesn't hold here because there is statutory authority for the secretary to review and revise council proposals. So, we think on all three of those points, we actually think Braidwood supports the government's position, and we think it provides further support to our approach on case, both on the merits and on ratification or severance. The Appointments Clause issue is before the Third Circuit now or will be shortly in the Flounder Limit case? Yes, it's scheduled for argument on July 10, and on that issue. I do think other, I also want to emphasize, you know, many courts have looked at fishery management proposals and have consistently viewed the council's role as advisory. The executive branch has a longstanding view of the council's role as being advisory. We think this at least shows that it's fairly possible to read the Act this way, and if it's fairly possible to read the Act this way, constitutional avoidance requires reading the Act this way, and there's a lot of features in the Act that we think really reinforce this reading. If you look at the finding and purposes in 16 U.S.C. 1801b5 that talks about the purpose of the councils, it says so there's a forum for people to participate and advise on, local interests can participate and advise on the statute. There's a function of the councils in H1, which is to prepare or submit proposals. Before your time's up, just to clarify, I think Judge Wiener asked you, and I know the district court asked you, it is an outlier structure. You can't think of any other structure that occupies such a strong advisory position. Is there any analog you would point us to that under the plaintiff appellant's argument would be appointments clause violative to? We don't think there is. I don't think we would find that something that's exactly like this, but, you know, cumbersome procedural processes aren't a constitutional violation, even if the councils have substantial practical influence. That's not the same as having legal power to execute or administer the law, so we don't think they meet that standard anyways. Thank you. If there's no further. You good, Judge Angelsen? Yes, thank you. Okay, we will now turn to the rebuttals, and we've got, we'll start with John Thompson. Thank you, Your Honor. No time is short, so I'll try to be very brief and identify three things from the government's presentation and then answer any questions that the judges have. First, the idea that the councils do not execute and administer federal law is belied by the text of the act, and the OLC opinion that my friend on the other side relied on, says that the question for inferior officer status is whether or not the position possesses authority to act in the first instance, whether or not that act may be subject to direction or review by superior officers. The idea that this is subject to some freewheeling importance analysis by government litigators is nowhere in any Supreme Court opinion. It is not an OLC on independent litigating authority. Is that the one? This is officers of the United States within the meaning of the appointments clause from 2007. So it's not officially, it's not about the independent, okay. No, yeah, it's about what makes you an officer. And so the other point briefly, I mean, on ratification, we've heard a lot from the government that the secretary has the authority to do what she did here, and I haven't heard any convincing explanation of where that authority comes from. It cannot come from 1854 C1 because the council did initiate the rulemaking process. That's how this comes up to the court. It can't come from 1855 D because that is about promulgating, implementing regulations and amendment 54 is not implementing. It is changing the substance of the fishery management plan that governs the species. And it can't come from 1854 E as the government says, because that sets a two year exclusivity window where only the council can act. And that's exactly what happened here. So the government doesn't actually explain where this authority to do the act done comes from. It's 1854 B. They make a proposal very like the amendment 16 before the Supreme Court. It goes up. They make sure it conforms to the national standards. Then you get notice and comment, and then full rulemaking final rule comes out. Isn't that sort of exactly what we see in Braidwood management? Well, the problem with that, your honor, is that as I explained in the first part of my  So that was off the table. If you agree with us on the appointments clause, which because we're discussing remedy, you necessarily have at this point in the analysis, right? You've concluded that the council is void. Ab initio cannot perform these actions. Well, but you remember the moose juice site that the government in the district court mentioned? That's where the D.C. Circuit assumed for the sake of argument in appointments cause violation, but then said ratify. That doesn't work here. And that's because of how this act is set up, right? If you assume for sake of argument that the council has no lawful authority to act, then the specific statute authority invoked by the secretary to promulgate the rule falls apart because the necessary predicate to that we have said is void. Ab initio either as a matter of assumption or as a matter of conclusion of the court. It simply doesn't work. And the last thing I know I'm out of time with your honor's position. I just if I could make one last point on this idea that Arthrex severance is available. It is not. And Arthrex made clear that Arthrex was talking about the distinction between principal and inferior officers. If you read free enterprise fund, it says that the judiciary has no authority to whittle down enough of an inferior officer's powers to turn them an employee that is expressed in free enterprise fund. That option is off the table here. Thank you, your honors. Thank you. And now we'll hear from Michael. Thank you, your honor. I want to make two quick points and I want to get to ratification first on the two step rulemaking process. The fact that the secretary can review the council's measures doesn't matter. This court in Burgess versus FDIC noted that the FDIC reviews the ALJ's decisions. They're no vote. The FDIC could waive the ALJ's powers, do the ALJ's functions itself, direct the ALJ how to act. Still, so long as the ALJs were allowed to act, they wielded significant authority. On 1854H and the other powers outside the two step rulemaking process, those are not ancillary provisions. They're important because what they end up doing is they force the president who should be able to execute federal fisheries policy on his own through his officers. It forces him to bargain with officials controlled by states. That's not how federal regulations are supposed to work. The president is supposed to be able to control the executive branch and the regulations that go out from it. On ratification, first, I don't think that rate would actually embrace the idea that ratification can cure appointments clause defects. What it was saying was that contrary to the task force analysis where it said the secretary didn't have the statutory authority to revise and implement, do the task force's own actions itself, and therefore under NRA political victory fund, it couldn't ratify, the court was saying that that requirement of ratification was satisfied. But it goes on to say, according to the government, the secretary has to exercise a statutory and has effectively cured whatever appointments clause issues afflict ACIP and HRSA. Even if we were prepared to accept ratification as a valid means of curing appointments clause defects, we cannot accept the secretary's attempt to do so here. So the court did not actually accept the idea that ratification can cure appointments clause defects. It was contrasting the ratification for the ACIP and HRSA actions under NRA political victory fund with the lack of fulfilling those requirements for the task force. And ratification wouldn't fit here because ratification is the idea that you've delegated an action to someone else and you're taking that action yourself later. There is no—the action here that the council took was the adoption under—I don't remember the provisions, but the adoption of a fishery management plan and the adoption of implementing regulations, what the secretary can do is promulgate implementing regulations. The council hasn't done that here. The secretary can't—she can adopt fishery management plans and regulations, but not under the provisions that the council did. So it's really a mismatch of—there's no delegation, there's no agency relationship, which is necessary for a ratification. It's another authority that the council has exercised. The secretary doesn't have. Thank you. Okay, Judge Jenkinson has one more question. With the government, we explored a little bit the congressional intent. And in other words, we've identified the text in the statute that you say usurps or constrains. We've been asking questions about—I have been—about no other court yet has described them as more than advisory. But going back to the purpose, it is still a little odd for me, and I'd like to hear your response, that if the origin of this, the only way for the Magnuson Act compromise to have come into place, was to allow state participation and, you know, bottom-up inclusivity, it would seem odd for us as a court to say, oh, well, actually, this is top-down. These are all federal officers. Isn't there a conflict between what we know was Congress's purpose to have bottom-up stakeholder state involvement versus us recharacterizing it, saying, well, actually, they're all federal officers? No, Your Honor. I think that the Constitution forbids certain kinds of novel arrangements that may be efficient and effective in some ways, because the framers saw farther than that. Well, then the follow-up to the last question would be, what about Myers-Footnote 56? Frankly, Your Honor, I don't recall Myers-Footnote 56. That's not important. That's not important. Thank you very much. You've all been very clear. Thank you. Thank you, Your Honor. Okay. Well, I also thank you very much for doing the argument. The case is now under consideration, and we will let you all leave. Please do. Thank you.